IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **TERRY JOYNER**, individually, and<br>a **CLASS** of similarly-situated persons, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.: |
| **CITY OF ATLANTA**, and<br>**CHIEF ERIKA SHIELDS**,<br>in her individual capacity, | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF REGARDING TERRY JOYNER AS AN INDIVIDUAL AND ALL SIMILARLY SITUATED PERSONS AS A CLASS

Plaintiff, Lieutenant Terry Joyner, files this Complaint on behalf of himself,

and as a representative of all similar situated members of a class, against

Defendants City of Atlanta and Chief Erika Shields, using 42 U.S.C. § 1983 to

vindicate their rights to equal protection under the Fourteenth Amendment of

the U.S. Constitution, and other applicable Constitutional provisions.

# INTRODUCTION

## A. The City of Atlanta Police Department's intentional race-based discriminatory policy

Former Deputy Chief Ernest Finley (now Chief of Police in Montgomery, Alabama) testified in a related case[1] that since 2002, the Atlanta Police Department ("APD") implemented a practice that ensured that when a command-ranking officer was replaced by another officer, the replacing command-officer was the same race as the departing command-officer; this occurred 100 percent of the time with each of the six field operations zones that comprised the Field Operations Division, as illustrated by deposition testimony and Lt. Joyner's photographic lay out of these zones. (See Deposition of Ernest Finley, April 1, 2019, pp. 47:20-49:15; 50:3-21; 50:22-51:16.)[2] (Compare Exhibit 1, **photographs** demonstrating that the Captains and Majors of Zone 1 were replaced by a person of the same race, with Exhibit 2, **photographs** demonstrating that the Captains and Majors of Zone 2 were replaced by a person of the same race, with Exhibit 3, **photographs** demonstrating that the Captains and Majors of Zone 3 were replaced by a person of the same race, with Exhibit 4,

---

[1] Joyner v. City of Atlanta, et al.; Case No. 1:16-cv-1780-TWT-LTW (N.D.G.A.)
[2] This must be filed under seal because the Defendants demanded a protective order that included deposition transcripts in the related case.

**photographs** demonstrating that the Captains and Majors of Zone 4 were replaced by a person of the same race, <u>with</u> Exhibit 5, **photographs** demonstrating that the Captains and Majors of Zone 5 were replaced by a person of the same race, <u>with</u> Exhibit 6, **photographs** demonstrating that the Captains and Majors of Zone 6 were replaced by a person of the same race.) Finley further swore under oath that this "white-out, white-in" and "black-out, black-in" practice was implemented when former Chief Pennington became the Chief of the Atlanta Police Department in 2002 and was still in place when Finley left the APD in 2014. (<u>See</u> Deposition of Ernest Finley, April 1, 2019, pp. 47:20-49:15; 50:22-51:16.)

On top of Finley, Former Chief George Turner (now Commissioner of Public Safety for the City of Atlanta) testified that this "white-out, white-in" and "black-out, black-in" practice became policy, and that it was in place when Turner was Chief of Atlanta Police Department from 2010 to 2017. (<u>See</u> Deposition of George Turner, April 3, 2019, pp. 46:10-15; 50:8-51:11.) [3] Turner swore under oath to the following:

---

[3] This must be filed under seal because the Defendants demanded a protective order that included deposition transcripts in the related case.

1. **Race plays a role** in the decision to replace a person with the title of Captain or higher. Id. at pp. 56:6-57:10.

2. When Turner was Chief and was appointing a person to Captain or higher, he looked for the most qualified people *but that those people were the same race as the Captain or higher that was being replaced*. Id. at pp. 56:6-57:10.

3. From 2010 through 2016, the outgoing Captains and Majors who got replaced were the same race as the Captains and Majors who Turner appointed to replace them. Id. at pp. 24:12-46:3.

4. The race of a Captain does not affect the ability of that person to perform the job duties of a Captain. Id. at pp. 12:3-13:2.

5. He could understand the concern of a Lieutenant that was stuck in a zone with a Captain who was a different race because that Lieutenant would have to move out of that zone to a different zone to replace a Captain who is the same race as that Lieutenant. Id. at p. 64:1-25.

## B. The intentional race-based discriminatory policy continues

Currently, this intentional race-based discriminatory pattern, practice, and policy continues, as evidenced in every zone of the City of Atlanta Police Department: *each of the six zones that comprise the Field Operations Division that has a*

*Black Captain must have a White Major and each zone that has a White Captain must have a Black Major:*

### Zone 1
Major C. Hampton (Black Male)
Captain J. Canton (White Male)

### Zone 2
Major B. Shaw (White Male)
Captain A. Singh (Black Male)

### Zone 3
Major C. Murphy (Black Female)
Captain A. Senzer (White Male)

### Zone 4
Major T. Griffin (Black Male)
Captain B. Schiffbauer (White Male)

### Zone 5
Major D. Schierbaum (White Male)
Captain D. Villaroel (Black Male)

### Zone 6
Major N. Klotzer (White Male)
Captain A. Clay (Black Male)

## C.  The APD appointment process

Lt. Joyner deposed a Major and Captain during the related case, and neither had any idea how the process works with respect to moving up rank. In fact, both said they know of absolutely no policy or procedure governing the process and that there is no application process either. Initially, Chief Finley

stated under oath that, while being the third-highest ranking officer within the entire APD, he had no idea how the process of being appointed to the rank of Captain or higher works, but then the parties took a deposition break. Finley then said sometimes Deputy Chiefs met with the Chief to discuss upcoming changes, but even when discussing this issue, Finley made sure to emphasize that there was no "rhyme or reason" to this process and that the process was almost a "joke." No wonder Chief Turner and all other Chiefs could so easily and wholly exclude APD from consideration for certain positions based solely on race.

**D. Joyner's great law enforcement history**

As for the Plaintiff, Lt. Joyner is the son of the City of Roswell's former Chief of Police and City Councilman, Terry L. Joyner, who was also director of security for Lockheed. Plaintiff Joyner, a 50 year old white male officer, has dedicated 27 years of his life serving the public as an Atlanta Police Department ("APD") officer. Unfortunately, once Lt. Joyner complained about race discrimination against him, he has never gotten a promotion or appointment—in over 10 years.

Prior to complaining about race discrimination, Lt. Joyner was on a **promotional fast track**, moving from Investigator to Sergeant in two years and from Sergeant to Lieutenant in less than five years—meaning within 6 years he was promoted three times; whereas now he has been stagnant for over a decade in retaliation for complaining about race discrimination. Lt. Joyner is a decorated officer receiving multiple commendations—including the prestigious medal of valor award and officer of the year award—prior to complaining about race discrimination.

### E.  The effect of the City's intentional race-based discriminatory policy on Terry Joyner and other officers

At the center of this lawsuit is the fact that Defendants made purely race-based decisions that excluded Joyner from being appointed to particular Captain appointments because of his race, an appointment for which Joyner has been more qualified than the persons who received said appointments. The insidiousness of this policy and practice can be understood by Joyner's situation. Joyner is Caucasian and was up for an appointment to the rank of Captain in his Zone 2, but the Captain in Joyner's zone was black. **This meant that Joyner would be wholly excluded from consideration for the Captain position in Zone 2—solely because Joyner is white and that position, under Defendants' pattern, practice and policy, had to be filled by a black person**.

Moreover, because three of the six Captain positions within Zones 1 through 6 are mandatorily held by African-Americans, that means Defendants will not even consider Joyner for these three Captain positions because he is white. This insidious practice has the exact same intentionally discriminatory effect on similarly situated African-American Lieutenants. And, woe for are all APD Lieutenants who are not African American or Caucasian—such as Latinos and Asians—they have no chance.

This pattern, practice, and policy is an affront to our Constitution and hurts all APD officers, in particular those Lieutenants who are locked out of an appointment to the rank of Captain or higher *merely because of the color of their skin.*

## JURISDICTION AND VENUE

1.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(4), and 42 U.S.C. § 1983.

2.

This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202. This Court may also grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil

Procedure. This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

3.

Venue is proper under 28 U.S.C. § 1391(b) and L.R. 3.1(B)(3) because (1) a substantial part of the events and omissions giving rise to Lt. Joyner's claims occurred within this District and Division and (2) Defendants reside and transact business in this District and Division.

<strong><u>PARTIES</u></strong>

4.

At all times relevant to this Complaint, **Plaintiff Terry Joyner** was a citizen of the United States and a resident of Georgia. Joyner is currently a highly decorated Lieutenant Officer for the Atlanta Police Department.  At all times relevant to this Complaint, Joyner had clearly established legal rights under state and federal law and the United States Constitution. Joyner submits himself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, and any other permissible damages.

5.

At all times relevant to this Complaint, **Defendant Erika Shields** was a United States citizen, a Georgia resident, and the sworn Police Chief for the City of Atlanta. At all relevant times to this Complaint, Shields was acting under the color of state and federal laws. At all relevant times, Shields was subject to the laws of the State of Georgia and the Constitution of the United States. At all relevant times, Shields was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general orders, guidelines, and regulations of the Atlanta Police Department, while upholding her responsibility as Chief of Police for the City of Atlanta. Shields has always known, since being Chief of APD, that the City charter outlaws the type of discrimination that excludes an APD officer from obtaining any particular position based on race.

Shields has continued to exclude Lt. Joyner from the position of Captain or higher based on race. Joyner, under Shields' practice and policy, cannot obtain the position of Captain in three zones because these positions are held by African-Americans. Like those three Captain positions within zones 1-6, Joyner, under Shields' policy and procedure, cannot obtain the position of Major in three zones solely because those positions are held by African-Americans. Shields has

implemented, condoned and ratified the policy of excluding APD officers from obtaining particular positions of Captain and Major based on race. If a Lieutenant is the opposite race of a Captain or Major within his or her zone, then that Lieutenant must go to a different zone that has a Captain or Major of the same race. In fact, Shields will simply exclude any APD officer from obtaining the position of Captain or Major within Zones 1-6 if that APD officer is not the same race of said Captain or Major.

Joyner is using 42 U.S.C. § 1983 and 42 U.S.C § 2000 et seq and other applicable federal laws as the vehicle to sue Shields in her individual capacity regarding federal claims. Shields may be served, personally, at her place of employment.

6.

**Defendant City of Atlanta** is a municipality organized and existing under the laws of the State of Georgia, County of Fulton, and has been so for a period preceding six months prior to the filing of this case. Also, at the time of the subject event that has given rise to this lawsuit, the City of Atlanta was the public employer of Defendant Shields, as well as the public employer of Plaintiff Joyner.

The City of Atlanta has developed, promoted, and condoned a pattern, practice, and policy of strictly race-based decision-making with respect to

appointing or hiring officers to fill the position of Captain or higher in Atlanta Police Department's Field Operations Division. The City of Atlanta's pattern, practice, and policy is to ensure that the positon of Captain or higher is filled with the same race of the person who vacated said position in Zones 1 through 6 of the Field Operations Division. Former Deputy Chief of the Atlanta Police Department, Defendant Finley, testified that this pattern, practice, and policy of "white-out, white-in" and "black-out, black-in" has been in place since 2002. Former Chief Turner, who is now the Commissioner of Public Safety for the City of Atlanta, which oversees the Atlanta Police Department, testified on April 3, 2019 that this "white-out, white-in" and "black-out, black-in" pattern, practice, and policy was in place when Turner was Chief of Atlanta Police from 2010 to 2017. Currently, the pattern, practice, and policy continues, as evidenced in every zone of the City of Atlanta Police Department; *each zone that has a Black Captain must have a White Major and each zone that has a White Captain must have a Black Major*:

> **Zone 1**
> Major C. Hampton (Black Male)
> Captain J. Canton (White Male)
>
> **Zone 2**
> Major B. Shaw (White Male)
> Captain A. Singh (Black Male)

**Zone 3**
Major C. Murphy (Black Female)
Captain A. Senzer (White Male)

**Zone 4**
Major T. Griffin (Black Male)
Captain B. Schiffbauer (White Male)

**Zone 5**
Major D. Schierbaum (White Male)
Captain D. Villaroel (Black Male)

**Zone 6**
Major N. Klotzer (White Male)
Captain A. Clay (Black Male)

*Therefore, on information and belief, the current Chief of the Atlanta Police, Erica Shields, has adopted and continues to implement and enforce this policy.*

Specifically, the City of Atlanta excluded Joyner *and other similarly situated persons* from an appointment to Captain, on multiple occasions, because Joyner's status as a Caucasian nullified his consideration for said position. That position had to be filled by an African-American because said position was being vacated by an African-American.

Joyner is using the U.S. Constitution, federal statutes, 42 U.S.C. § 1983, and other applicable federal laws, as the vehicle to sue the City of Atlanta regarding his federal claims. The City of Atlanta may be served by serving its Mayor, personally, at her place of employment.

## STATEMENT OF FACTS

### A.  Joyner's Stellar Track Record as an APD Officer

7.

Over his 27-year law enforcement career, Lt. Joyner has received a litany of commendations due to his public service, professionalism, and loyalty to citizens of Atlanta and his colleagues at APD.

8.

Over his 27-year law enforcement career, Defendant City of Atlanta (through Former Chief Turner himself) gave Lt. Joyner the Meritorious Service Award for saving the life of a citizen who had just shot a state law enforcement officer.

9.

Over his 27-year law enforcement career, Lt. Joyner has received the Peace Officer of the Year award.

10.

Over his 27-year law enforcement career, Lt. Joyner has received the Police Medal of Valor award.

11.

Over his 27-year law enforcement career, Lt. Joyner has received the Medal of Honor award for pulling five people out of a house fire, a courageous act that caused Joyner to be hospitalized for smoke inhalation.

12.

Over his 27-year law enforcement career, Lt. Joyner has received the Commendation of Excellence Award.

13.

Over his 27-year law enforcement career, Defendant City of Atlanta (through Chief Turner) gave Lt. Joyner the Judge Arthur Kaplan Community Service Award.

14.

Over his 27-year law enforcement career, Lt. Joyner has received the award of Outstanding Assistance to U.S. Secret Service Atlanta Office.

15.

Over his 27-year law enforcement career, Lt. Joyner has received the award of City Council Proclamation.

16.

Lt. Joyner has a "clean" internal affairs file. Simply put, Lt. Joyner's conduct as a police officer is above reproach, just as his loyalty to APD.

## B.  Joyner was on a steady promotional track prior to complaining about racial discrimination

17.

In 2000, Joyner was promoted to Investigator by APD.

18.

In 2002, Joyner was promoted from Investigator to Sergeant by APD, with a ranking on his Sergeant's exam of 11 out of 91 qualifying candidates for the Sergeant position.

19.

In 2007, Joyner was promoted from Sergeant to Lieutenant by APD, while being ranked 8 out of 71 qualifying candidates for the Lieutenant position.

## C.  Joyner complains to the City of Atlanta about racial discrimination

20.

Joyner was on a promotional fast track trajectory until 2008; that's when Lt. Joyner fulfilled his lawful duty of reporting what he perceived to be racial discrimination to his superior officer, Major Ernest Finley.

21.

At the time that Joyner reported racial discrimination, Finley lost his temper by angrily screaming at Joyner.

22.

Within days of reporting racial discrimination to Finley, another Lieutenant working in the same zone as Joyner and Finley told Joyner to watch his back since Joyner complained about racial discrimination to Finley and therefore Finley would "come after Joyner forever."

23.

The day after Joyner reported discrimination to Finley, and after becoming angry with Joyner, Finley told Joyner to investigate the situation *internally*. Instead, Joyner prompted an *external* investigation by reporting the situation as required by APD policy to internal affairs. Finley was *outraged* and verbally scolded Joyner for not investigating the situation internally. After Finley verbally scolded Joyner for turning the racial discrimination case over to internal affairs, Joyner left Finley's office. By the time Joyner reached his own office at another precinct, Finley had already officially *transferred* Joyner from his day watch commander position over criminal investigation with Saturdays and Sundays off, to the night watch patrol division where he has to work weekends.

24.

After receiving a retaliatory schedule change, Joyner reported Finley for violating his constitutional rights, and that led to a meeting with the City Attorney; shortly thereafter, Joyner was allowed to pick his work assignment.

25.

Shortly after Finley exploded on Joyner for reporting racial discrimination, **Finley was promoted to Deputy Chief of Field Operations**, the second-highest position next to actually being Chief of Police, at that time.

26.

In 2007, Joyner was promoted from Sergeant to Lieutenant by APD, while being ranked 8 out of 71 qualifying candidates for the Lieutenant position—of the 63 people ranked lower than Joyner, 13 people have been appointed to a rank of Captain or Major, and Joyner was passed over for those appointments because he reported racial discrimination to both Finley and internal affairs. In fact, **at the time that the thirteen officers who were ranked lower than Joyner on the Lieutenants exam were appointed to the higher rank of Captain or Major, the Majority of those officers were less qualified than Joyner for said appointments in terms of years of experience, commendations/awards, and disciplinary track records**.

27.

Many of the persons who have been appointed to Captain, while Joyner remained a Lieutenant, were less qualified than Joyner to be Captain, evidenced by some of the people appointed to Captain ahead of Joyner having criminal arrests and extensive histories of sustained complaints by APD's Office of Professional Standards division.

28.

In addition to not receiving the Zone 2 Captain position given to Ms. Steed because of his race, Joyner has also been blacklisted by Defendants because he reported racial discrimination to Defendants and thus has never received a promotion or appointment since reporting racial discrimination to internal affairs and Finley.

29.

Many of the persons who have been appointed to Major, while Joyner remained a Lieutenant, were less qualified than Joyner to be Major, evidenced by some of the people appointed to Major ahead of Joyner having criminal arrests and extensive histories of sustained complaints by APD's Office of Professional Standards.

30.

After reporting racial discrimination in 2008, Defendants prohibited Joyner from attending external command training, knowing that command training is an essential qualification for appointment beyond the rank of Lieutenant, and knowing that Joyner was more qualified than others to take external command training.

**D. Defendants excluded Joyner from obtaining the position of Captain Zone 2 because he is white, based on a pattern, practice and policy of "white-out, white-in" and "black-out, black-in"**

31.

Defendants have a pattern, practice, and policy of making strictly race-based decisions by replacing positions of Captain and above with the same race of the superior officer who vacated his/her position. For example, Defendants have a pattern, practice, and policy of replacing black Captains by appointing/replacing *only* a black officer to that vacated position of Captain.

32.

In January 2015, four Lieutenants were appointed to the higher rank position of Captain. At that time, Joyner was in Field Operations, and one of the four open Captain positions was for the position of Captain over Field Operations in Zone 2 where Joyner worked. The problem for Joyner was the fact

that the former Captain of Field Operations for Zone 2 was black. Thus, due to the pattern, practice, and policy of Defendants, the next person to fill that position had to be black. Consequently, Defendants placed a black Lieutenant (Sharonne Steed) in the open Captain position, to the exclusion of Joyner solely because he was white. Notably, Joyner was more qualified than Lieutenant Steed, including the fact that Joyner had six years of service in that zone as a Lieutenant, acting as the watch commander, criminal investigations commander, and special teams commander. On top of that, Joyner had more commendations/awards and more experience as a law enforcement officer than black Lieutenant Steed, who was appointed to Captain of Field Operations for Zone 2. Steed is now Joyner's direct command.

**E. Additional Facts from Testimony of Finley, Steed, Rasmussen, and Turner in support of Plaintiff's Title VII Racial Discrimination Claim, Equal Protection Claim, and Claim for Prohibitory and Mandatory Injunctions**

**1. Finley's Testimony regarding the appointment of officers to the position of Captain or higher**

33.

Chief Finley testified that when he was Deputy Chief, there were no objective, written criteria to determine who is appointed to the position of Captain or higher -- it is at the sole discretion of the Chief of the Atlanta Police. (See Deposition of Ernest Finley, pp. 39:14-43:6.)

34.

Chief Finley testified that no employment files or other documents are reviewed for the appointment of persons to the positions of Captain or higher, that he has never recommended anyone for the appointment of persons to the positions of Captain or higher, and that he never filled out an application for any of his positions of Captain or higher. Id.

35.

Chief Finley testified that there was absolutely *no rhyme or reason* to the appointment process and that to him, and to most, the *process was almost a joke*. Id.

2. **Steed's testimony regarding the appointment of officers (including herself) to the position of Captain or higher**

36.

Steed was appointed Captain of Zone 2 in December 2014.

37.

Steed testified that she never filled out an application, nor was she asked to fill out an application, to become Captain of Zone 2. She was also never interviewed for the position of Captain, nor does she know of anyone recommending her for the position. In fact, Steed testified that she didn't even

know the position of Zone 2 Captain was open when she was appointed. (See Deposition of Sharonne Steed, March 26, 2019, pp. 40:18-41:21.) [4]

38.

Prior to being appointed Captain by Chief Turner, Steed never even expressed interest in becoming Captain to anyone at APD. See Id. at pp. 43:3-18.

39.

Since becoming Captain, Steed doesn't know how the process operates for officers appointed to ranks of Captain or higher. See Id. at pp. 41:22-42:13.

3. **Major Daniel Rasmussen's testimony regarding the appointment of officers (including himself) to the position of Captain or higher**

40.

Major Daniel Rasmussen of the Atlanta Police Department testified that from the time he has been a Major, he has never recommended someone to be appointed to the position of Lieutenant or higher, and that those positions are decided by the Chief. Rasmussen testified that he has no idea how the appointment process works. (See Rasmussen Dep., March 28, 2019, pp. 16:23-

---

[4] This must be filed under seal because the Defendants demanded a protective order that included deposition transcripts in the related case.

17:18.) [5] Rasmussen testified that he does not know of any policies for that process. See Id. at pp. 17:19-24; 17:25-18:9.

41.

Rasmussen testified that he never filled out an application to become a Captain. He was also never interviewed for the position of Captain, nor does he know of anyone recommending him for the position. See Id. at p. 18:10-21. He simply saw his name on a list and got a call from Chief Turner informing him he had become Captain. See Id. at pp. 18:22-19:1.

42.

Rasmussen testified that a couple decades ago, the rank of Captain was a rank achieved by a test but at some point, the rank of Captain was removed and later reinserted as a position that was determined by the chief. See Id. at pp. 16:23-17:18; 19:14-21.

43.

Rasmussen testified that he does not know if certain awards are considered when appointing an officer to a rank of Captain or higher and that he

---

[5] This must be filed under seal because the Defendants demanded a protective order that included deposition transcripts in the related case.

does not know anything about the process of appointment into those ranks or

how that process works. See Id. at p. 24:9-21.

**4. Finley's testimony regarding the "white-out white-in, black-out black-in" practice/custom for appointing officers to the position of Captain and higher**

44.

Regarding this "white-out white-in, black-out black-in" pattern, which

**ensured that a command-ranking officer was replaced by an officer of the**

**same race,** Finley testified that this was a practice implemented in Atlanta Police

Department in 2002 by Chief Pennington from New Orleans. (See Deposition of

Ernest Finley, pp. 47:20-49:15; 50:22-51:16.)

45.

Regarding this "white-out white-in, black-out black-in" pattern and

practice, Finley testified that this was the practice of the Atlanta Police

Department, and that Chief Turner continued this implemented practice through

Finley's retirement from APD in 2014.  See Id. at pp. 47:20-48:10; 50:22-51:16.

(Compare Exhibit 1, **photographs** demonstrating that the Captains and Majors of

Zone 1 were replaced by a person of the same race, with Exhibit 2, **photographs**

demonstrating that the Captains and Majors of Zone 2 were replaced by a person

of the same race, with Exhibit 3, **photographs** demonstrating that the Captains

and Majors of Zone 3 were replaced by a person of the same race, with Exhibit 4,

**photographs** demonstrating that the Captains and Majors of Zone 4 were replaced by a person of the same race, <u>with</u> Exhibit 5, **photographs** demonstrating that the Captains and Majors of Zone 5 were replaced by a person of the same race, <u>with</u> Exhibit 6, **photographs** demonstrating that the Captains and Majors of Zone 6 were replaced by a person of the same race.)

46.

The "white-out white-in, black-out black-in" pattern and practice continued through Finley's retirement from APD in 2014. (<u>See</u> Deposition of Ernest Finley, pp. 47:20-49:15; 50:22-51:16.)

47.

Finley testified that while he worked at APD, he didn't think APD had many Asian or Hispanic persons of rank. <u>Id</u>. at p. 50:3-21.

5. **Commissioner Turner's testimony regarding the "white-out white-in, black-out black-in" pattern and practice becoming the policy for appointing officers to the position of Captain and higher**

48.

George Turner testified that this "white-out, white-in, black-out, black-in" practice became policy, and that it was in place when Turner was Chief of Atlanta Police from 2010 to 2016. (<u>See</u> Deposition of George Turner, April 3, 2019, pp. 46:10-15; 50:8-51:11.) When Turner was confronted with the pictures of the

Captains and Majors of each zone from 2010-2016 as well as the orders signed by Turner dictating which people would be appointed to replace each Captain and Major, Turner confirmed that those Captains and Majors being replaced were the same race as the Captains and Majors who were being appointed to replace them. Id. at pp. 24:12-46:3.

49.

Commissioner Turner testified that race plays a role in the decision to replace a person with the title of Captain or higher. Id. at pp. 56:6-57:10.

50.

Commissioner Turner testified that when he was Chief and was appointing a person to Captain or higher, he looked for the most qualified people, but that those people were the same race as the Captain or higher that was being replaced. Id. at pp. 56:6-57:10.

51.

Commissioner Turner testified that he could understand the concern of a Lieutenant that was stuck in a zone with a Captain who was a different race because that Lieutenant would have to move out of that zone to a different zone to replace a Captain who is the same race as that Lieutenant. Id. at p. 64:1-25.

52.

Commissioner Turner testified that the race of a Captain does not affect the ability of that person to perform the job duties of a Captain. <u>Id</u>. at pp. 12:3-13:2.

**F.  Class Action Allegations**

53.

Plaintiff brings this suit as a class action on behalf of himself and all others similarly situated (the "Class") pursuant to Rules 23(a), 23(b)(1), and 23(b)(2).

54.

Plaintiff seeks to represent the following Class on claims for declaratory and injunctive relief: **All current and future City of Atlanta Police Department officers with the rank of Lieutenant or Captain.**

55.

Plaintiff reserves the right to amend the class definition if further investigation and discovery demonstrates that the class definition should be narrowed, expanded, or otherwise modified. Excluded from the Class are all non-human persons/entities, Defendants, and Defendants' attorneys. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

56.

As a result of Defendants' pattern, practice, and policy of replacing the position of Captain or higher with the same race of the person who vacated said position, all Lieutenants and Captains are being systematically denied the opportunity to obtain the position of Captain and Major based purely on their race. It is Defendant City of Atlanta's endemic, purely race-based pattern, practice, and policy that results in hiring decisions that prohibit Terry Joyner and putative Class members from obtaining the rank of Captain or higher. This pattern, practice, and policy is an affront to our Constitution and hurts all APD officers, in particular those Lieutenants who are locked out obtaining a position of Captain or higher *merely because of the color of their skin.* As a result, members of the Class are or will be deprived of their constitutional rights to Equal Protection under the Fourteenth Amendment. Therefore, Plaintiff and putative Class members seek declaratory and injunctive relief to remedy Defendant City of Atlanta's illegal and unconstitutional actions, policies, and practices.

57.

The requirements of **Rule 23(a), 23(b)(1)**, and **23(b)(2)** are satisfied by this class action.

1. **Rule 23(a)**

   i. **Numerosity**

58.

The information as to the exact and present size of the Class and the identity of the persons in the Class is in the control of Defendant City of Atlanta. On information and belief, the Class presently encompasses between 65 and 80 persons. This number is based on the fact that there were approximately 70 Lieutenants in 2014 and there are currently six Captains in Zones 1 through 6. The number of persons who are members of the Class described above are so numerous that joinder of all members in one action is impracticable.

   ii. **Commonality**

59.

Questions of law and fact common to the entire Class predominate over individual questions because the actions of Defendant City of Atlanta complained of herein—with respect to Equal Protection—were generally applicable to the entire class. The common answers that Plaintiffs seek are simple and will result in a common resolution for the class. These legal and factual questions include, but are not limited to:

a.  Whether the City of Atlanta has implemented and condoned the pattern, practice, and policy that excludes an Atlanta Police officers from being appointed to a particular position of Captain or Major within Zones 1 through 6 of the Field Operations Division because of those officers' is not the same race as the departing Captain or Major within Zones 1 through 6 of the Field Operations Division;

b.  Whether a municipality can lawfully implement and condone a pattern, practice, and policy the excludes a police officer from being appointed to a particular position of Captain or Major because of that officer's race;

c.  Whether the City of Atlanta has a compelling government interest to justify a pattern, practice, and policy of excluding an Atlanta Police officers from being appointed to a particular position of Captain or Major within Zones 1 through 6 of the Field Operations Division because of those officers' is not the same race as the departing Captain or Major within Zones 1 through 6 of the Field Operations Division;

d.  Whether the City of Atlanta's pattern, practice, and policy of excluding Atlanta Police officers from being appointed to a particular position of Captain or Major because those officers' are not the same race as the departing Captain or Major within Zones 1 through 6 of the Field

Operations Division is narrowly tailored to further a compelling

government interest specifically identified by the City;

e.  If the City of Atlanta's reasons for its pattern, practice, and policy of

excluding Atlanta Police officers from being appointed to a particular

position of Captain or Major within Zones 1 through 6 of the Field

Operations Division because of those officers' race are "clearly identified

and unquestionably legitimate";

f.  Whether Defendant City of Atlanta's "white-out, white-in, black-out,

black-in" pattern, practice, and policy violates the Equal Protection

Clause of the Fourteenth Amendment to the U.S. Constitution; and

g.  Whether the Constitution permits the City of Atlanta to knowingly deny

citizens the rights and benefits of being appointed to a higher-ranking

police officer based on the color of their skin.

### iii.  Typicality

60.

Plaintiff's claims are typical of the members of the Class because Plaintiff

and all Class members were injured by the same wrongful pattern, practice, and

policy of the City of Atlanta as described in this Complaint: each are locked out of

being appointed to a particular position of Captain or Major within Zones 1

through 6 of the Field Operations Division because of those Class members' race.

Plaintiff's claim against the City of Atlanta with regard to Equal Protection arises

from the same practices and course of conduct (the "white-out, white-in, black-

out, black-in" pattern, practice, and policy) that give rise to the Equal Protection

claim against the City of Atlanta of the Class members and is based on the same

legal theories.

### iv.   Adequacy

61.

Plaintiff will fairly and adequately protect the interests of the Class.

Plaintiff has no interests that are contrary to or in conflict with those of the Class

he seeks to represent.

62.

Plaintiff has retained competent counsel in both civil rights and class action

litigation and will provide affidavits in support of this in his motion for class

certification.

### 2. Rule 23(b)(1)

63.

In this case, prosecuting separate actions by individual class members

would create a risk of inconsistent or varying adjudications with respect to

individual class members and would establish incompatible standards of conduct for the party opposing the class. Here, if any other potential class member filed a lawsuit in this Court or in State Court seeking to declare the City of Atlanta's pattern, practice, and policy of "white-out, white-in, black-out, black-in," this could create the risk of inconsistent or varying adjudications between or within these courts. In addition, if any other potential class member filed a lawsuit in this Court or in State Court seeking to enjoin the City of Atlanta to cease their practice of intentional discrimination and/or replace this pattern and practice and policy with a legitimate, non-discriminatory policy and practice, this could create competing injunctions in which the City could be in the bizarre and untenable position of being unable to comply with one court order without simultaneously violating another court order. Therefore, certification of the Class under Rule 23(b)(1) is proper.

**3. Rule 23(b)(2)**

64.

Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper. Based on the pattern, practice and policy of "white-out, white-in, black-out, black-in," Defendant City of Atlanta has acted or refused to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with regard to Class members as a whole and certification of the Class under Rule 23(b)(2) proper.

## COUNT I
## 42 U.S.C. § 1983—VIOLATION OF FOURTEENTH AMENDMENT RIGHTS TO EQUAL PROTECTION
### (*Claim Against Defendants Shields and City of Atlanta*)

"**Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people,**" *Rice v. Cayetano,* 528 U.S. 495, 517 (2000), **and therefore "are contrary to our traditions and hence constitutionally suspect,"** *Bolling v. Sharpe,* 347 U.S. 497, 499 (1954). **" '[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment,' "** *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 505 (1989) (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 533–534 (1980) (Stevens, J., dissenting)), **"the Equal Protection Clause demands that racial classifications ... be subjected to the 'most rigid scrutiny.' "** *Loving v. Virginia,* 388 U.S. 1, 11 (1967). **To implement these canons, judicial review must begin from the position that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect."** *Fullilove, supra,* 448 U.S. at 523, (Stewart, J., dissenting); *McLaughlin v. Florida,* 379 U.S. 184, 192 (1964). **Strict scrutiny is a searching examination, and it is the government that bears the burden to prove " 'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate,' "** *Croson, supra,* at 505 (quoting *Fullilove, supra,* 448 U.S. at 533–535 (Stevens, J., dissenting)). ***Grutter* made clear that racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests."** 539 U.S., at 326.

[Fisher v. Univ. of Texas at Austin, 570 U.S. 297, 309–10 (2013) (internal quotation marks omitted).]

> **The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis.**

[City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501 (1989) (citing Korematsu v. United States, 323 U.S. 214, 235–240 (1944) (Murphy, J., dissenting).

65.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-52, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

66.

Ernest Finley testified that since 2002, the Atlanta Police Department implemented a practice that ensured that when a command-ranking officer was replaced by another officer, the replacing command-officer was the same race as the departing command-officer, that this "white-out, white-in, black-out, black-in" practice was implemented when former Chief Pennington became the Chief of the Atlanta Police Department in 2002 and that this practice was still in place when Finley left the APD in 2014.

67.

On top of Finley, George Turner testified that this "white-out, white-in, black-out, black-in" practice became policy and was in place when Turner was

Chief of Atlanta Police from 2010 to 2016. Turner also testified that from 2010

through 2016, the outgoing Captains and Majors who got replaced were the same

race as the Captains and Majors who Turner appointed to replace them. Turner

further **testified to the following:** Race plays a role in the decision to replace a

person with the title of Captain or higher; when Turner was Chief and was

appointing a person to Captain or higher, he looked for the most qualified people

*but that those people were the same race as the Captain or higher that was being replaced*;

he could understand the concern of a Lieutenant that was stuck in a zone with a

Captain who was a different race because that Lieutenant would have to move

out of that zone to a different zone to replace a Captain who is the same race as

that Lieutenant; and that the race of a Captain does not affect the ability of that

person to perform the job duties of a Captain.

68.

Based on the incorporated facts to support this Count, and the facts set

forth in this Count, Shields implemented and condoned a pattern, practice, and

policy of intentionally discriminating against City of Atlanta Police officers based

on their race. This discrimination was for the purposes of disqualifying police

officers from being appointed to the position of Captain or higher. As a

consequence, because Plaintiff Joyner is Caucasian, he could not be appointed to

the position of Captain because the vacating Captain was African American and that meant—due to Defendant Turner and City of Atlanta's pattern, practice, and policy—that the new Captain had to be African-American. This pattern, practice and policy is an affront to our Constitution and hurts all APD officers, in particular those Lieutenants who are locked out of an appointment to position of Captain or higher *merely because of the color of their skin.* **This policy hurts everyone.**

69.

Because the Fourteenth Amendment to the Constitution guarantees that citizens will not be discriminated against because of their race, and because 42 U.S.C. § 1983 prohibits state actors such as Shields from violating constitutional rights, Shields is liable for her unconstitutional conduct. Consequently, Joyner is entitled to all compensation under governing law.

**COUNT II**
**42 U.S.C. § 1983—<u>MONELL</u> CLAIM—VIOLATION OF FOURTEENTH AMENDMENT RIGHTS TO EQUAL PROTECTION**
(*Claim Against Defendant City of Atlanta*)

70.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-64, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

71.

Ernest Finley testified that since 2002, the Atlanta Police Department implemented a practice that ensured that when a command-ranking officer was replaced by another officer, the replacing command-officer was the same race as the departing command-officer, that this "white-out, white-in, black-out, black-in" practice was implemented when former Chief Pennington became the Chief of the Atlanta Police Department in 2002, and that this practice was still in place when Finley left the APD in 2014.

72.

On top of Finley, George Turner testified that this "white-out, white-in, black-out, black-in" practice became policy and was in place when Turner was Chief of Atlanta Police from 2010 to 2016. Turner also testified that from 2010 through 2016, the outgoing Captains and Majors who got replaced were the same race as the Captains and Majors who Turner appointed to replace them. Turner further **testified to the following:** Race plays a role in the decision to replace a person with the title of Captain or higher; when Turner was Chief and was appointing a person to Captain or higher, he looked for the most qualified people *but that those people were the same race as the Captain or higher that was being replaced*; he could understand the concern of a Lieutenant that was stuck in a zone with a

Captain who was a different race because that Lieutenant would have to move out of that zone to a different zone to replace a Captain who is the same race as that Lieutenant; and that the race of a Captain does not affect the ability of that person to perform the job duties of a Captain.

73.

Based on the incorporated facts to support this Count, and the facts set forth in this Count, the City of Atlanta implemented and condoned a pattern, practice, and policy of intentionally discriminating against City of Atlanta Police officers based on their race, and this discrimination was done for the purposes of disqualifying police officers from obtaining the position of Captain or higher. Currently, the pattern, practice, and policy continues, as evidenced in every zone of the City of Atlanta Police Department; *each zone that has a Black Captain must have a White Major and each zone that has a White Captain must have a Black Major*:

**Zone 1**
Major C. Hampton (Black Male)
Captain J. Canton (White Male)

**Zone 2**
Major B. Shaw (White Male)
Captain A. Singh (Black Male)

**Zone 3**
Major C. Murphy (Black Female)
Captain A. Senzer (White Male)

**Zone 4**
Major T. Griffin (Black Male)
Captain B. Schiffbauer (White Male)

**Zone 5**
Major D. Schierbaum (White Male)
Captain D. Villaroel (Black Male)

**Zone 6**
Major N. Klotzer (White Male)
Captain A. Clay (Black Male)

*Therefore, on information and belief, the current Chief of the Atlanta Police, Erica*

*Shields, has adopted and continues to implement and enforce this policy.* As a

consequence, Class members cannot attain positions of Major or Captain based

on their race due to Defendant City of Atlanta's pattern, practice and policy. This

pattern, practice and policy is an affront to our Constitution and hurts all APD

officers, in particular those Lieutenants who are locked out of obtaining a

position of Captain and Captains who are locked out of being appointed to a

position of Major *merely because of the color of their skin.*

74.

Because the Fourteenth Amendment to the Constitution guarantees the

that citizens will not be discriminated against because of their race, and because

42 U.S.C. § 1983 prohibits municipalities from violating constitutional rights

pursuant to a policy or custom, the City of Atlanta is liable for its endemic

unconstitutional conduct. Consequently, Joyner is entitled to all permissible remedies under governing law, including injunctive relief and damages. The Class seeks injunctive relief, as specifically sought in the ensuing two counts.

## COUNT III
## CLAIM FOR INJUNCTIVE AND DECLARATORY RELIEF
### (*Claim Against All Defendants*)

75.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-64, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

76.

Based on the incorporated facts to support this Count, Defendant City of Atlanta has violated Plaintiff and Class members' rights to Equal Protection under the Fourteenth Amendment of the U.S. Constitution. Plaintiff and Class members therefore seek a TRO, injunctive relief and declaratory relief requiring the City to immediately cease its pattern, practice, and policy of excluding police officers from a particular appointment of Captain or Major because of their race.

77.

Due to the irreparable nature of the harm perpetually inflicted on Class members as a result of Defendant City's unconstitutional policy and practice, the

lack of prejudice to Defendant City in being required to implement a legitimate nondiscrimination policy and practice, and the compelling interests of the public in remedying the City's unlawful conduct, a prohibitory injunction is appropriate and fundamental to the resolution of this action.

## COUNT IV
## ATTORNEY FEES

**Based on the facts alleged in this complaint,** Plaintiff and Class members are entitled to attorney fees under all applicable laws.

**WHEREFORE**, Lt. Joyner prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That Plaintiff recover all costs of this litigation;

(c) That a jury trial be had on all issues so triable;

(d) That this Court certify a Class for the purposes of the permanent injunctive relief sought based on the proposed Class definition in this Complaint, subject to any modifications this Court deems proper for the adjudication of the rights alleged to be violated;

(e) That this Court issue an injunction and declaratory relief, requiring the City of Atlanta to immediately abandon its policy of intentional racial

discrimination in employment decisions at the City of Atlanta Police

Department; and

(f) That Plaintiff receives such other and further relief as the Court deems

just and proper.

Respectfully submitted this 12th day of April 2019,

/s/MARIO WILLIAMS
Mario B. Williams (Ga # 235254)

**WILLIAMS OINONEN, LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
404-404-654-0288 / 404-592-6225 FAX
mario@goodgeorgialawyer.com
mwilliams@ndh-law.com

/s/DAVID E. BETTS
David E. Betts (Ga # 055850)

**BETTS & ASSOCIATES**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
404-577-8888 / 404-577-0080 FAX
davidbetts@bettslaw.net

/s/ANDREW R. TATE
ANDREW R. TATE (Ga # 518068)

**NEXUS DERECHOS HUMANOS ATTORNEYS, INC.**
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
404-254-0442 / 404-935-9391 FAX
atate@ndh-law.com

-44-